IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

JEFFREY LAGRASSO and          CASE NO.
DEBORAH LAGRASSO,

    Plaintiffs,

vs.

SEVEN BRIDGES HOMEOWNERS
ASSOCIATION, INC., a Florida
corporation, and RACHEL ABOUD
TANNENHOLZ,

    Defendants.

_____/

## COMPLAINT AND JURY DEMAND

Plaintiffs, JEFFREY LAGRASSO and DEBORAH LAGRASSO (collectively "Plaintiffs" or "LAGRASSO"), by and through their undersigned attorneys, hereby sue the Defendants, SEVEN BRIDGES HOMEOWNERS ASSOCIATION, INC. and RACHEL ABOUD TANNENHOLZ, and state as follows:

## JURISDICTION AND VENUE

1. This is an action for, *inter alia,* compensatory and punitive damages relating to post-acquisition housing discrimination on the basis of religion pursuant to 42 U.S.C. § 3601, et. seq. (hereinafter referred to as the "Fair Housing Act" or the "Act").

2. Specifically, Plaintiffs allege that Defendants violated 42 U.S.C. § 3604(b) and 42 U.S.C. § 3617 by discriminating on the basis of their religion and intentionally inflicting emotional distress.

3. This Court has original jurisdiction over the subject matter of this action pursuant to 42 U.S.C. § 3613(a) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

4. Venue is proper under 28 U.S.C. §§ 1391(b) and (c).  Defendants are located and reside within this district, and the events giving rise to this Complaint occurred in this district.

## THE PARTIES

5. Plaintiff JEFFREY LAGRASSO is a natural person, over the age of majority, residing in Palm Beach County, Florida.

6. Plaintiff DEBORAH LAGRASSO is a natural person, over the age of majority, residing in Palm Beach County, Florida.

7. At all relevant times, Plaintiffs were married to each other as husband and wife, have owned real property and have resided in the Seven Bridges community in Palm Beach County, Florida.  Mr. and Mrs. LAGRASSO are aggrieved persons as that term is defined by the Act, 42 U.S.C. § 3602(i), and have suffered harm resulting from the conduct of the Defendants.

8. Defendant SEVEN BRIDGES HOMEOWNERS ASSOCIATION, INC. (also the "Association" or "HOA") is a Florida corporation that, at all relevant times, governed the Seven Bridges community ("Seven Bridges"), a housing development that consists of approximately 700 residential homesites in west Boca Raton, Florida.  The HOA board was vested with the authority to make decisions on behalf of its members and used its authority to undertake actions inconsistent with federal Fair Housing Laws.  The HOA may be served with process through its registered agent, Louis Caplan, Esq., 6111 Broken Sound Parkway NW, Suite 200, Boca Raton, FL  33487.

9. Defendant RACHEL ABOUD TANNENHOLZ (also "TANNENHOLZ") is a natural person, over the age of majority, rising in Palm Beach County, Florida.  At all relevant times, TANNENHOLZ owned real property and resided within Seven Bridges.  At all relevant times, the husband of TANNENHOLZ was a member of the HOA compliance committee.  TANNENHOLZ may be served with process at 9120 Moriset Court, Delray Beach, FL  33446.

2

## **GENERAL ALLEGATIONS**

10. Plaintiffs have three children together, ages 11, 13, and 16 (also the "LaGrasso Children").

11. In or about September 2018, Plaintiffs purchased a home within Seven Bridges for their family (the "Property" or the "Home").

12. Plaintiffs were attracted to Seven Bridges, in part, due to its supposed world class tennis facility which offered, for a fee, professional coaching services which Plaintiffs considered for their children.

13. In or about October 2018, Plaintiffs agreed with the HOA to engage the tennis coaching services for their children.

14. Pursuant to the terms of the oral tennis engagement, the HOA agreed to provide coaching services and exclusive use of three (3) tennis courts from 7:30 a.m. to 8:30 a.m., five (5) days per week. This schedule was coordinated so that the LaGrasso children could play each day before school.

15. In exchange for the tennis coaching and use of the courts, Plaintiffs agreed to pay approximately $1,050.00 per week.

16. Plaintiffs made all payments required by the HOA for the tennis coaching services.

17. Prior to November 22, 2019, the LaGrasso children became continuously harassed by a group of approximately eight women who had formed a "tennis league" so that they could reserve for themselves multiple tennis courts for large blocks of time. Upon information and belief, the tennis league consists only of the eight women.

18. Prior to November 22, 2019, the "tennis league" would show up early to the courts where the LaGrasso Children were playing and would harass the LaGrasso Children by interrupting their lessons; distracting their coaches and engaging in irrelevant conversation; antagonizing the LaGrasso children by walking upon the courts where they were receiving their

instruction; taunting the children by making demeaning comments to the LaGrasso Children about their skill levels and abilities; and aggravating the children by moving their personal belongings from nearby tables and chairs.

19. Prior to November 22, 2019, Mrs. LAGRASSO lodged several complaints with the HOA and the tennis director about the harassment, suggesting that the tennis league be assigned to different courts or different times so as to reduce the risk of any further interactions by the tennis league with her children.

20. On November 22, 2019, after having exhausted all efforts with the HOA and the tennis director, and after yet another round of harassing behavior toward the LaGrasso children, Mrs. LAGRASSO went to the tennis courts to speak to the woman identified by the LaGrasso Children as having made demeaning remarks that morning (later identified as Elana Ecker).

21. Mrs. LAGRASSO demanded that Ms. Ecker and her friends cease any and all interactions with the LaGrasso Children, stop interfering with their lessons, and stop handling their personal belongings.

22. During the conversation, the other women from the tennis league stopped their play, came over from the adjacent court to surround Mrs. LAGRASSO, and engaged in a shouting match with Mrs. LAGRASSO while waving their racquets in a threatening manner.

23. Security was called and the women were separated.

24. On December 5, 2019, Mrs. LAGRASSO received a certified letter from the HOA. The letter stated, in part, that Ms. Ecker and her friends had filed "numerous serious complaints" alleging that Mrs. LaGrasso had physically assaulted them. A copy of the letter from the HOA is attached as **Exhibit A**.

25. The letter also indicated that the HOA Board had voted unanimously to suspend Mrs. LAGRASSO's rights to the HOA property and facilities for three months pending the opportunity for a hearing before a compliance committee selected by the Board. Upon information

and belief, the husband of Defendant TANNENHOLZ was selected by the HOA Board as one of the members of the compliance committee.

26.   On February 13, 2020, the compliance committee conducted its "hearing", indicated that it had no evidence other than the statements from Ms. Ecker and her friends, and made clear that it had not undertaken any independent inquiry to obtain any other evidence.

27.   Mrs. LAGRASSO, on the other hand, presented video evidence at the hearing showing that she did not touch any of the women and that Ms. Ecker and her friends were the ones aggressively surrounding Mrs. LAGRASSO and waving their tennis racquets in her face. Mrs. LAGRASSO also presented statements from coaching and tennis center staff members (at least one of which was subsequently fired as a result), corroborating the fact that the "tennis league" had been harassing the LaGrasso Children on numerous occasions and had instigated the argument that morning. Indeed, one of the HOA's own tennis personnel stated:

> "Hi Debbie, if the girls got upset about that lady… no need to take it personal, specifically these ladies have problems with everyone around. We didn't want to jump in on the spot cuz [sic] it could cause more drama. Our staff gives your family huge [sic] apology for what happened…. I'm on your side in what happened."

Another one of the HOA's own tennis personnel also sided with Mrs. LaGrasso:

> "I am so sorry for the incident today! I feel terrible you had to deal with those ladies."

And then the next day, that person was fired by the HOA:

> "Hi Debbie. Eric [the tennis director] fired me on Saturday. He gave me no notice and offering no severance pay after 2 years working there and also gave me no reason why I was actually getting let go… I believe those 3 women played a part in it as well."

28.   On February 20, 2020, and notwithstanding the fact that Mrs. LAGRASSO had proffered credible, third party statements establishing that the other women had instigated the

5

dispute, the HOA sent Mrs. LAGRASSO a second certified letter, this time advising that the committee had voted unanimously to affirm the suspension. A copy of the second letter from the HOA is attached as **Exhibit B**.

29. Thereafter, the HOA and members of its compliance committee embarked on a concerted effort to stigmatize and alienate the LaGrasso family.

30. In or about early 2020, Mrs. LAGRASSO attended a homeowner association meeting and overheard other residents whispering comments such as "that's her", followed by chuckling and laughter which embarrassed Mrs. LAGRASSO. As a result, Mrs. LAGRASSO left the meeting immediately thereafter.

31. Subsequently, Mrs. LAGRASSO began to experience a series of personal attacks on an anonymous Facebook blog that she had created to promote discussions about the community.

32. The Facebook blog, titled "Bridges Seven", re-posted media articles published about Seven Bridges and about recent trends experienced by other homeowner associations.

33. The Facebook blog also provided editorial comment and opinion about Seven Bridges and attempted to rally homeowner participation at HOA meetings, sometimes using political cartoons to drive the point:



34. On or about May 16, 2020, Defendant TANNENHOLZ somehow identified Mrs. LAGRASSO as the editor of the Facebook blog.

35. Defendant TANNENHOLZ began posting hateful comments personally attacking Mrs. LAGRASSO and her Christian faith on Facebook such as by demanding that she "Move out you stupid Shikska". A screenshot of the Facebook comment is attached as **Exhibit C**.

36. According to Wikipedia, the term "Shiksa" is a disparaging and offensive term applied to a non-Jewish girl or woman. Wikipedia also mentions that, in 2014, Rabbi Jack Abramowitz described it as "simply indefensible", "inherently condescending, racist and misogynistic". Jack Abramowitz (December 18, 2014), *The Jewish N Word*.

37. On or about May 17, 2020, Defendant TANNENHOLZ obtained Mrs. LAGRASSO's cell phone number and began to harass Mrs. LAGRASSO via text message stating "I know who you are… [g]et ready to be exposed". A screenshot of text messages from TANNENHOLZ is attached as **Exhibit D**.

38. On May 18, 2020, at approximately 12:30 p.m., Defendant TANNENHOLZ inferred that she intended to torment Mrs. LAGRASSO by pitting the entire Seven Bridges community against her. In text messages from Defendant TANNENHOLZ she stated …. [b]usted…. [s]oooo busted…. I suggest you follow the real 7b residents page you will see your name plastered on there." *See id*.

39. At approximately 2:08 p.m., Defendant TANNENHOLZ sent a text message stating "Wassup Deborah…. [l]ooking for a designer…. you available[?]" *See id*.

40. Defendant TANNENHOLZ then posted the following comment on the official residents Facebook page for the Seven Bridges community: "[s]o apparently there is this new page up that is bashing the community and the owner of it is a true anti Semite… After much research it was found that the page is owned by a Deborah LaGrasso that lives on Labelle court". A screenshot of the Facebook comment is attached as **Exhibit E**.

41. At approximately 6:00 p.m., Defendant TANNENHOLZ arrived at the LAGRASSO home, rang their doorbell repeatedly, and banged on the front door of the home yelling "come outside". Defendant TANNENHOLZ was asked to leave several times but refused. The police were called and issued a warning to Defendant TANNENHOLZ that she would be arrested for trespassing if she returned to the LAGRASSO home.

42. On May 19, 2020, at approximately 1:00 p.m., Defendant TANNENHOLZ and her daughter drove to the LAGRASSO home and repeatedly yelled "move out, bitch!"

43. On that same day, the LAGRASSO's hired a bodyguard to protect them.

44. On May 20, 2020, Defendant TANNENHOLZ, after again driving to the LAGRASSO home and yelling profanities, was recorded on a call stating that the family should move out of the neighborhood because they are not Jewish:

"You can record this conversation and send it to whoever you want."

"You moved in somewhere which is 80% Jewish and you do not belong here."

"Move to a Klan neighborhood, that's where you need to move, to a white supremacist area."

"If I was hated as much as you I would move out."

"I would not want to live where I could not walk out with everybody looking at me like I'm fucking crazy and that is the current situation whether you like it or not."

"Move the fuck out. It's over for you."

45. On May 27, 2020, Mr. LAGRASSO sent a letter to the HOA requesting that it "open a case and initiate its formal complaint and sanctioning process for the extremely disturbing, harassing and discriminatory conduct toward my wife and children by Rachel Aboud Tannenholz, a neighbor in our community." A copy of the letter sent to the HOA is attached as **Exhibit F**.

46. The letter advised the HOA that the LAGRASSO's had "video and audio recordings of Ms. Tannenholz engaging in repeated and protracted harassing and discriminatory conduct including trespassing upon our property, loitering and waiting outside of our home, shouting from the front yard, making anti-semitic statements and slanderous comments, and stalking my wife both physically and online.

47. Notwithstanding the detailed complaint from Mr. LAGRASSO and the invitation to review video and audio recordings proving the harassment, the HOA upon information and belief took no action to investigate the matter or to control the conduct of Defendant TANNENHOLZ.

48. Rather, the HOA began a second round of sanctioning against the LAGRASSO's.

49. On June 12, 2020, the HOA sent another certified letter to Mrs. LAGRASSO, this time alleging that the comments on her own Facebook blog about the association were "baseless and false". The letter also alleged that Mrs. LAGRASSO had verbally assaulted Defendant

TANNENHOLZ when Defendant TANNENHOLZ was trespassing at the LAGRASSO home. A copy of the third letter from the HOA is attached is **Exhibit G**.

50. The letter took the position that the HOA could limit Mrs. LAGRASSO's speech pursuant to the "Nuisance" and "Improper Use" sections of the governing documents of the community which, of course, seek to curtail conduct "at any Home or Lot or in or about any portion of the Community" and not outside of the community (or on the Internet). Specifically, the sections relied upon by the HOA are as follows --

> NUISANCES. No obnoxious or offensive activity as determined by the Board shall be carried <u>on or about the Lots or in or about any Improvements, Homes, or on any portion of Seven Bridges</u> nor shall anything be done therein which may be or become an unreasonable annoyance or a nuisance to any Owner. No use or practice shall be allowed in or around the Homes which, as determined by the Board, is a source of annoyance to Owners or occupants of Homes or which interferes with the peaceful possession or proper use of the Homes or the surrounding areas. *See* Article X, Section 2, Declaration of Covenants, Restrictions and Easements (emphasis added).

> NO IMPROPER USE. No improper, offensive, hazardous or unlawful use shall be made <u>of any Home nor shall anything be done thereon</u> tending to cause embarrassment, discomfort, annoyance or nuisance to any person using any portion of the Property. All valid laws, zoning ordinances, orders, rules, regulations, codes and other requirements of all governmental bodies having jurisdiction thereover shall be observed. *See* Article X, Section 4, Declaration of Covenants, Restrictions and Easements (emphasis added).

> Improper Use. No improper, hazardous or unlawful use shall be made <u>of the Association Property or any Home or Lot</u>. *See* Rule 3 of the General Section of the Rules (emphasis added).

> Nuisance. No obnoxious activity shall be carried on <u>at any Home or Lot or in or about any portion of the Community</u>. Nothing shall be done which may be an unreasonable annoyance or nuisance to any other Owner or which interferes with the peaceful possession or proper use of the Homes or the surrounding areas. Nothing shall be done within the Association Property or any Home or Lots which tends to cause embarrassment, discomfort or unreasonable annoyance or nuisance to any Owner or such Owners family members, guests, invitees and tenants using

10

any portion of the Community. *See* Rule 4 of the General Section of the Rules (emphasis added).

*See id.*

51.    The HOA further stated that the Board had once again voted unanimously against Mrs. LAGRASSO and had proposed cumulative fines in the total amount of $5,000 and cumulative suspensions of access and use of the common areas for 330 days. Lastly, the letter threatened to apply the suspension to the entire LAGRASSO family.

52.    On July 1, 2020, the compliance committee conducted another of its required "hearings".

53.    On July 8, 2020, the HOA sent Mrs. LAGRASSO a certified letter advising of the confirmation by the compliance committee of the fine and suspension of use rights. A copy of the fourth letter from the HOA is attached as **Exhibit H**.

54.    The series of baseless fines and suspensions, the refusal of the HOA to reasonably investigate the veracity of complaints from sources likely to be biased, the relationship between the HOA and Defendant TANNENHOLZ, and the refusal of the HOA to control the harassing and discriminatory conduct of TANNENHOLZ, among other acts and omissions, demonstrates a systematic discrimination by the HOA against the LAGRASSO's.

## COUNT I
### Violation of 42 U.S.C. § 3604 against HOA

55.    Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 54 of this Complaint as if fully set forth in this paragraph.

56.    42 U.S.C. § 3604(b) prevents any person from discriminating against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services

or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

57. Defendant HOA violated the Fair Housing Act by discriminating against the LAGRASSO's religious beliefs through a systematic strategy to assess baseless sanctions against them that limited their ability to use services or facilities of the community and by their inaction to control the conduct of neighbors, including Defendant TANNENHOLZ, which also limited their ability to use services or facilities of the community.

58. Specifically, Defendant HOA through its Board and compliance committee engaged in a scheme of repeatedly accusing and sanctioning Mrs. LAGRASSO for alleged community violations that either (a) arose from complaints that it could not – and would not – verify; or (b) arose from alleged violations of rules and regulations that do not exist.

59. As relating to the sanctions assessed against Mrs. LAGRASSO for the tennis court argument, Defendant HOA knew or should have known the accusations were from a group of friends that were targeting Mrs. LAGRASSO; knew or should have known that the accusations were false, not credible, or unsupported when made; intentionally refused to conduct any independent review of the accusations before "unanimously voting" to propose sanctions against Mrs. LAGRASSO; and intentionally refused to conduct any independent review of exculpatory information received during sham compliance committee hearings and before "unanimously voting" to adopt all proposed sanctions.

60. As relating to the Facebook posts, Defendant HOA knew or should have known that its rules and regulations did not contain any language limiting speech on the Internet and that, as a result, it had no basis upon which to sanction Mrs. LAGRASSO.

61. As relating to any sanction for an alleged verbal assault, Defendant HOA knew or should have known that it had no basis upon which to sanction Mrs. LAGRASSO given the

unequivocal audio and video recorded evidence showing that Mrs. LAGRASSO had been defending against a trespasser in TANNENHOLZ.

62. Defendant HOA also acted indirectly to violate the Fair Housing Act through its inaction in controlling the behavior of neighbors of the LAGRASSO's notwithstanding unequivocal audio and video recorded evidence that the LAGRASSO's faced verbal and physical threats, and were being harassed because of their religion, all of which limited their ability to use services or facilities of the community.

63. Indeed, the statements by TANNENHOLZ, the wife of an HOA compliance committee member, that the LAGRASSO's should move out of the neighborhood because they are not Jewish; Defendant HOA's actual knowledge of the discriminatory statements; and its ignorance and refusal to undertake any effort to control the discriminatory conduct demonstrates that an invidious discriminatory purpose was a motivating factor behind the actions and inactions of Defendant HOA.

64. As a result, Defendant HOA created a hostile living environment in an effort to discourage the LAGRASSO's from continuing to live in the Association.

65. The conduct of Defendant HOA had a discriminatory effect on the Plaintiffs due to their religion.

66. The discriminatory actions of Defendant HOA were intentional, willful, and taken in disregard of the rights of the Plaintiffs.

## COUNT II
### Violation of 42 U.S.C. § 3617 against HOA

67. Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 66 of this Complaint as if fully set forth in this paragraph.

68. Under 42 U.S.C. § 3617, it is unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of any right granted by the Fair Housing Act.

69. Defendant HOA has intimidated the LAGRASSO's by sending certified letters threatening and imposing baseless sanctions and fines, specifically as relating to Mrs. LAGRASSO's postings on her own Facebook blog page and for defending against a trespasser.

70. The Facebook blog posts are protected speech and the LAGRASSO's never agreed by virtue of the community documents or otherwise to give up their rights to free speech outside of the Seven Bridges community.

71. The certified letters from Defendant HOA threatening baseless sanctions and fines initially threatened and then subsequently subjected Mrs. LAGRASSO to the adverse action of incurring the baseless sanctions and fines.

72. Because the sanction and fine letters from Defendant HOA specifically indicate that the Facebook blog posts are the basis for the sanctions and fines, a causal link exists between the protected activity and the adverse action.

73. Defendant HOA also interfered with the exercise and enjoyment of the LAGRASSO family's property rights by refusing to undertake any action to control the behavior of third parties including Defendant TANNENHOLZ.

74. As a result of the intimidation and interference of their rights to enjoy their property, the Plaintiffs have constantly lived in fear, keeping their doors locked at all times, hiring body guards to protect the family, and by undertaking instruction in the use of firearms for protection.

**COUNT III**
**Intentional Infliction of Emotional Distress Against TANNENHOLZ**

75. Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 54 of this Complaint as if fully set forth in this paragraph.

76. This is an action against Defendant TANNENHOLZ for intentional infliction of emotional distress.

77. Defendant TANNENHOLZ's conduct was intentional or reckless, that is, she intended her behavior when she knew or should have known that emotional distress would likely result. Specifically, and as explained more fully above, Defendant TANNENHOLZ expressed her intent in no uncertain terms to torment and harass Mrs. LAGRASSO when she told her "I know who you are… [g]et ready to be exposed" and then the following day told Mrs. LAGRASSO that she was "[b]usted…. [s]oooo busted…. I suggest you follow the real 7b residents page you will see your name plastered on there".

78. Defendant TANNENHOLZ then published statements on the "real 7b residents page" including but not limited to those accusing Mrs. LAGRASSO of being a "true anti Semite". Such statements were made with the intent of inciting the entire Seven Bridges community against Mrs. LAGRASSO and her family in an effort to force the LAGRASSO's to move out of the community.

79. The conduct of Defendant TANNENHOLZ was outrageous, that is, to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community.

80. The conduct of Defendant TANNENHOLZ caused emotional distress to Mrs. LAGRASSO and the LAGRASSO family.

81. The emotional distress is severe such that the LAGRASSO family is concerned about their safety and well-being.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for a judgment against Defendants for:

1. Injunctive and equitable relief as the Court deems appropriate, including:

    i) De-annex the LAGRASSO Property from the HOA;

        ii)       Requiring Defendant HOA to attend training in Fair Housing and anti-discrimination;

2. Compensatory damages to be paid by Defendant HOA, according to proof at trial, including awarding such damages as will compensate Plaintiffs fully for their shock, humiliation, embarrassment, inconvenience, and economic loss caused by Defendants' discriminatory conduct pursuant to 42 U.S.C. § 3612(o)(3) and 42 U.S.C. § 3613(c);

3. Compensatory damages to be paid by Defendant TANNENHOLZ, according to proof at trial, including awarding such damages as will compensate Plaintiffs fully for their shock, humiliation, embarrassment, inconvenience, and economic loss caused by Defendants' intentional infliction of emotional distress;

4. Awarding punitive damages to the Plaintiff in the amount of SEVEN MILLION DOLLARS ($7,000,000) (*i.e.* $10,000 per lot within the community) pursuant to 42 U.S.C. § 3612(o)(3) and 42 U.S.C. § 3613(c) and state law for the intentional torts complained of herein. Defendants' conduct demonstrates a reckless disregard for those of certain religious backgrounds and is contrary to both federal and state law. The acts and omissions described above were willful and perform with actual or implied malice. To date, Defendants have never issued so much as an apology and continues, through direct and indirect actions, to create an atmosphere incompatible with the quiet use and enjoyment sought by the LAGRASSO's and their family.  Punitive and exemplary damages are therefore appropriate and should be imposed in this instance;

5. Costs and attorney's fees of this lawsuit, with interest pursuant to 42 U.S.C. § 3612(p);

6. Granting such further relief as this Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury for all issues so triable.


Dated:  July 16, 2020                    Respectfully submitted,

                                                     **MURDOCH WEIRES PLLC**
                                                     Attorneys for Plaintiffs
                                                     14 Southeast 4th Street
                                                     Boca Raton, Florida  33432
                                                     Tel.:  (561) 347-8700
                                                     Fax:  (561) 409-2341


By: _____/s/ Scott A. Weires_____
                                                     Scott A. Weires, Esq.
                                                     Florida Bar No. 0113761
                                                     sweires@mwnlegal.com
                                                     jliotta@mwnlegal.com