UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-81163-CV-MIDDLEBROOKS/Brannon

JEFFREY LAGRASSO and
DEBORAH LAGRASSO,

    Plaintiffs,

v.

SEVEN BRIDGES HOMEOWNERS
ASSOCIATION, INC. and
RACHEL ABOUD TANNENHOLZ,

    Defendants.

_____/

## ORDER DENYING MOTION TO DISMISS

THIS CAUSE comes before the Court on Defendant Seven Bridges Homeowners Association, Inc.'s ("the Association") Motion to Dismiss the Complaint and to Strike Plaintiffs' Claim for Punitive Damages, filed on August 25, 2020. (DE 21). Plaintiffs Jeffrey LaGrasso and Deborah LaGrasso ("the LaGrassos") responded in opposition on September 8, 2020. (DE 26). For the following reasons, the Motion is denied.

## BACKGROUND

In September 2018, Plaintiffs Jeffrey LaGrasso and Deborah LaGrasso, husband and wife, purchased a home in the Seven Bridges community in Boca Raton, Florida. (DE 1 ¶¶ 7–8, 11). Seven Bridges supposedly features a "world class tennis facility" where residents may engage professional coaching services at an additional cost. (*Id.* ¶ 12). In October 2018, the LaGrassos arranged with the Association for their three minor children to take tennis lessons on separate courts weekday mornings from 7:30 a.m. to 8:30 a.m. for approximately $1,050.00 per week. (*Id.* ¶¶ 10, 13–14). Sometime between starting their lessons and November 2019, a tennis league

1

consisting of approximately eight women began to regularly harass the LaGrasso children by "interrupting their lessons; distracting their coaches and engaging in irrelevant conversations; antagonizing the LaGrasso children by walking upon the courts where they were receiving their instruction; taunting the children by making demeaning comments to [them] about their skill levels and abilities; and aggravating the children by moving their personal belongings from nearby tables and chairs." (*Id.* ¶ 18). Mrs. LaGrasso reported the women's conduct to the Association and the tennis director on several occasions to no avail. (*Id.* ¶ 19).

On November 22, 2019, Elana Ecker, a member of the tennis league, made demeaning remarks to the LaGrasso children while they were receiving their morning coaching. (*Id.* ¶ 20). In response, Mrs. LaGrasso went to the tennis courts to demand that Ms. Ecker and her friends cease harassing her children. (*See id.* ¶¶ 20–21). Mrs. LaGrasso and Ms. Ecker's conversation drew the attention of league members playing on nearby courts. (*See id.* ¶ 22). The women approached and surrounded Mrs. LaGrasso; a "shouting match" ensued between them while the league women "wav[ed] their racquets in a threatening manner." (*Id.*). Security for the Association arrived on the scene and separated the women. (*Id.* ¶ 23).

On December 5, 2019, Mrs. LaGrasso received a letter from the Association, which stated in pertinent part that Ms. Ecker and her league mates had lodged several complaints alleging that Mrs. LaGrasso had physically assaulted them during the November 22, 2019 incident at the tennis courts. (*Id.* ¶ 24). The letter notified Mrs. LaGrasso that the Association's Board had unanimously voted to suspend her rights to the facilities within the Seven Bridges community for three months pending a hearing before a compliance committee selected by the Board. (*Id.* ¶ 25).

At the February 13, 2020 hearing, the compliance committee indicated that its evidence was limited to statements submitted by Ms. Ecker and the other women present during the incident

in question. (*Id.* ¶ 26). Mrs. LaGrasso presented video evidence showing that she did not touch any of the women and statements from tennis facility staff members indicating that the women instigated the confrontation by harassing the LaGrasso children, which they had done on previous occasions. (*Id.* ¶ 27). The day after making the statement, one such staff member was fired without notice or an explanation. (*Id.*). On February 20, 2020, Mrs. LaGrasso received a letter from the Association informing her that the compliance committee had unanimously voted to uphold the three-month suspension imposed by the Board. (*Id.* ¶ 28).

Thereafter, Mrs. LaGrasso began to receive "personal attacks" on an anonymous Facebook page she had created called "Bridges Seven." (*Id.* ¶¶ 31–32). Mrs. LaGrasso created the page to "promote discussions about the community," to "rally homeowner participation at HOA meetings," and to provide "editorial comment and opinion about Seven Bridges." (*Id.* ¶¶ 31, 33). The page's content included re-posted media articles covering Seven Bridges specifically and recent trends experienced by homeowner's associations generally. (*Id.* ¶ 32). The page also featured opinion-based posts that were sometimes accompanied by political cartoons. (*Id.* ¶ 33).

The Complaint alleges that these personal attacks primarily came from one Seven Bridges resident, Co-Defendant Rachel Aboud Tannenholz, and transpired over a period of five days in May 2020. On May 16, 2020, Ms. Tannenholz identified Mrs. LaGrasso as the administrator of the "Bridges Seven" Facebook page and subsequently began posting "hateful comments" on that page attacking Mrs. LaGrasso's "Christian faith." (*Id.* ¶¶ 9, 34–35). One such comment was "Move out you stupid Shikska."[1] (*Id.* ¶ 35 (internal quotation marks omitted)). Then, on May 17, 2020,

---

[1] "Shiksa" is a "disparaging and offensive term applied to a non-Jewish girl or woman." (DE 1 ¶ 36). Rabbi Jack Abramowitz has described the word as "simply indefensible," "inherently condescending, racist and misogynistic." (*Id.* (citing Jack Abramowitz, *The Jewish N Word*, ORTHODOX UNION (Dec. 18, 2014), https://www.ou.org/life/inspiration/jewish-n-word/)).

3

Ms. Tannenholz texted Mrs. LaGrasso the message "I know who you are . . . [g]et ready to be exposed." (*Id.* ¶ 37 (internal quotation marks omitted)). The following day, May 18, 2020, Ms. Tannenholz again texted Mrs. LaGrasso "[b]usted . . . [s]oooo busted I suggest you follow the real 7b residents page you will see your name plastered on there." (*Id.* ¶ 38 (internal quotation marks omitted)). Ms. Tannenholz then made a post on the official Seven Bridges Facebook page, stating "[s]o apparently there is this new page up that is bashing the community and the owner of it is a true anti Semite . . . After much research it was found that the page is owned by a Deborah LaGrasso that lives on Labelle court." (*Id.* ¶ 40 (internal quotation marks omitted)).

That same day, Ms. Tannenholz went to the LaGrasso's home, rang the doorbell repeatedly, banged on the front door, and yelled for Mrs. LaGrasso to come outside. (*Id.* ¶ 41). After Ms. Tannenholz refused to leave the LaGrasso's property, the police were called. (*Id.*). The police issued Ms. Tannenholz a warning, advising her that if she returned to the LaGrasso's home, she would be arrested for trespass. (*Id.*). The next day, Ms. Tannenholz and her daughter drove to the LaGrasso's home and yelled "move out, bitch!" leading the LaGrassos to hire a bodyguard. (*Id.* ¶¶ 42–43 (internal quotation marks omitted)). On May 20, 2020, Ms. Tannenholz again drove to the LaGrasso's house and yelled profanities. (*Id.* ¶ 44). In addition, that day, during a telephone conversation, Ms. Tannenholz told the LaGrassos that they "d[id] not belong" in Seven Bridges, a neighborhood that according to Ms. Tannenholz, is "80% Jewish." (*Id.* (internal quotation marks omitted)). Ms. Tannenholz advised the LaGrassos to "[m]ove to a Klan neighborhood . . . a white supremacist area." (*Id.* (internal quotation marks omitted)). Ms. Tannenholz continued that if "[she] was hated as much as [Mrs. LaGrasso] [she] would move out" to avoid living somewhere where she cannot walk outside without everybody looking at her like she is "fucking crazy." (*Id.* (internal quotation marks omitted)).

One week after the last of the above-described episodes, Mr. LaGrasso sent correspondence to the Association, in which he requested that the Board "open a case and initiate its formal complaint and sanctioning process for the extremely disturbing, harassing and discriminatory conduct toward my wife and children by Rachel Aboud Tannenholz, a neighbor in our community." (*Id.* ¶ 45 (internal quotation marks omitted)). Mr. LaGrasso advised in the letter that they had video and audio recordings pertaining to some of the episodes described in the letter. (*Id.* ¶ 46). The LaGrassos allege that the Association "took no action to investigate the matter or to control the conduct of" Ms. Tannenholz, whose husband apparently serves on the Board's compliance committee. (*Id.* ¶¶ 25, 47). Instead, the Association initiated another sanctioning process against Mrs. LaGrasso.

On June 12, 2020, Mrs. LaGrasso received a letter from the Association, alleging that Mrs. LaGrasso made certain "baseless and false" comments on her Bridges Seven Facebook page and had allegedly verbally assaulted Ms. Tannenholz when she was trespassing on the LaGrasso's property. (*Id.* ¶¶ 48–49 (internal quotation marks omitted)). The Association sanctioned Mrs. LaGrasso for the Facebook posts pursuant to the "Nuisance" and "Improper Use" provisions of the community's governing documents, which seek to restrict "obnoxious . . . improper, offensive, hazardous or unlawful" use or activity "at any Home or Lot or in or about any portion of the Community." (*Id.* ¶ 50). The correspondence further stated that the Board had unanimously voted to assess a $5,000 fine against Mrs. LaGrasso and to suspend her use of the community's common areas for 330 days. (*Id.* ¶ 51).

On July 1, 2020, the compliance committee again conducted a hearing to review the Board's sanctions, and on July 8, 2020, the Board sent a letter advising that it had decided to affirm the sanctions against Mrs. LaGrasso. (*Id.* ¶¶ 52–53).

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the allegations in a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing legal sufficiency, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).[2] "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).

When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and assume the truth of the plaintiff's factual allegations. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678; *see also Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (stating that an unwarranted deduction of fact is not considered true for purposes of determining whether a claim is legally sufficient). "[A] formulaic recitation of the elements of a cause of action

---

[2] "A court's review on a motion to dismiss is [generally] 'limited to the four corners of the complaint.'" *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (citation omitted). However, it may also consider "any documents referred to in the complaint which are central to the claims." *Id.* (citation omitted).

will not do." *Twombly*, 550 U.S. at 555 (citation omitted). "Factual allegations must be enough to raise [the plaintiff's] right to relief above the speculative level." *Id.*

## DISCUSSION

The LaGrassos bring two claims against the Association under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.* Count I alleges that the Association violated 42 U.S.C. § 3604(b), which prohibits discrimination on account of "race, color, religion, sex, familial status, or national origin" in connection with "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith . . . ." Count II alleges that the Association violated 42 U.S.C. § 3617, which makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section[s 3603–3606]." Federal courts have described the language of the FHA as "broad and inclusive," "prohibit[ing] a wide range of conduct," and having "a broad remedial purpose." *Ga. State Conference of the NAACP v. City of LaGrange*, 940 F.3d 627, 631–32 (11th Cir. 2019) (citing *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1278 (11th Cir. 2019) and *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972)) (internal quotation marks omitted). Here, both claims arise out of alleged "post-acquisition conduct" on the part of the Association, which, as a general matter, may be actionable under the FHA. *See id.* at 632 (concluding that § 3604(b) "reaches certain post-acquisition conduct, including post-acquisition conduct related to the provision of services, as long as those services are connected to the sale or rental of a dwelling"). The singular question before the Court is whether the Complaint plausibly alleges violations of these two provisions of the FHA.

7

### I. Violation of 42 U.S.C. § 3604(b) (Count I)

In Count I, the LaGrassos assert that the Association violated the FHA by "discriminating against [their] religious beliefs through a systematic strategy to assess baseless sanctions against them that limited their ability to use services or facilities of the community and by their inaction to control the conduct of neighbors . . . which also limited their ability to use services or facilities of the community." (DE 1 ¶ 57). The Association argues that Count I should be dismissed because (1) the LaGrassos fail to allege that the Association acted against Mrs. Lagrasso *because of* her religion; (2) the Association did not interfere with any of Mr. Lagrasso's use of the HOA's services or facilities and only temporarily suspended Mrs. Lagrassos; and (3) as a matter of law, the Association's alleged failure to control Defendant Tannenholz's actions does not give rise to liability on its part. (DE 21 at 6–12).

To state a claim under § 3604(b) of the FHA for religious discrimination, a plaintiff must allege facts that demonstrate the defendant discriminated against her "in the terms, conditions, or privileges of sale or rental of a dwelling, or *in the provision of services or facilities in connection therewith*, because of . . . religion . . . ." 42 U.S.C. § 3604(b) (emphasis added). Discrimination is "differential," "less favorable" treatment of similarly situated individuals. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005); *Newport News Shipbuilding & Dry Dock Co.*, 462 U.S. 669, 682 n.22 (1983). The phrase "because of" is synonymous with "by reason of" or "on account of," which, in other words, means that the protected characteristic—in this case, religion—was the "reason" that the defendant so acted. *Gross v. FBL Financial Servs.*, 557 U.S. 167, 176 (2009) (internal quotation marks omitted).

The LaGrassos maintain that the Association's imposition of sanctions against Mrs. LaGrasso on two occasions amounted to discrimination on the basis of religion. (DE 1 ¶ 58). With

respect to the first round of sanctions arising out of the tennis court incident, the LaGrassos assert that the Association discriminated against them on the basis of religion through its decision to accept the truth of the tennis league members' allegations while refusing to consider exculpatory evidence presented by the LaGrassos at the hearing. (DE 1 ¶¶ 58–59). The trouble with this assertion, as the Association points out, as far as a federal claim of *religious* discrimination is concerned, is that the facts, as alleged in the Complaint and taken as true, fail to indicate that the dispute between Mrs. LaGrasso and Ms. Ecker and the other tennis league members had anything to do with religion. (DE 21 at 6–8).

Indeed, the 18 factual allegations concerning the tennis court incident and the Association's handling of same by its Board and compliance committee do not mention the religions of the LaGrassos or of the tennis league members or of any particular member of the Board or compliance committee. Rather, the facts paint a picture of a confrontation between Mrs. Lagrasso, Ms. Ecker, and the other league women because of the group of women's harassing treatment of the LaGrasso children during their weekday morning tennis lessons that, according to the allegations, had no bearing on the LaGrassos' religious tradition. (DE 1 ¶¶ 17–22). Nor do the allegations concerning the Association's handling of the complaints filed by Ms. Ecker and her league mates make any mention of religion as having anything to do with the underlying incident or the Board and compliance committee's review thereof. (DE 1 ¶¶ 24–28). A plain reading of § 3604(b) requires that the alleged discriminatory conduct be "because of . . . religion . . . ." Given that there exist no allegations pertaining to religion with respect to the LaGrassos' claim arising out of the tennis court incident and the Association's handling of same, I find that they have failed to state a cause of action under the FHA based on this alleged misconduct.

With respect to the second round of sanctions for Mrs. LaGrasso's Facebook posts and alleged verbal assault, the LaGrassos likewise fail to allege facts that demonstrate that the Board and compliance committee's decision to sanction Mrs. LaGrasso was because of her religion. The Complaint does not allege a fact concerning religion until paragraph 35 out of 54 factual allegation paragraphs. Even then, only passing mention is made of Mrs. LaGrasso's "Christian faith" and the only allegation concerning the religious composition of the community is in a quotation by Ms. Tannenholz describing the Seven Bridges community as "80% Jewish." (DE 1 ¶¶ 35, 44 (internal quotation marks omitted)). Notwithstanding, unlike the allegations concerning the tennis court incident, the allegations concerning Ms. Tannenholz's conduct toward Mrs. LaGrasso in May 2020 and the Board and compliance committee's handling thereof, at the very least, involve religion. (DE 1 ¶¶ 34–53).

Again, taking the facts in the Complaint as true and drawing reasonable inferences in the LaGrassos' favor, that the Association allegedly "took no action to investigate" the allegations raised in Mr. LaGrasso's May 27, 2020 letter or "to control" Ms. Tannenholz's conduct toward the LaGrassos but instead to ultimately fine Mrs. LaGrasso $5,000 and ban her use of the community's facilities for 330 days indicate that the Association, at a minimum, treated Mrs. LaGrasso differently than it treated Ms. Tannenholz, suggesting discrimination "in the provision of services or facilities in connection with" the LaGrasso's home, that could have been, at least in part, "because of religion . . . ." 42 U.S.C. § 3604(b). Because of this possibility, I decline to dismiss Count I at this stage of the proceedings as it concerns alleged FHA violations in connection with Ms. Tannenholz's conduct and the second round of sanctioning.

The LaGrassos also assert that the Association violated the FHA "indirectly" by failing to control the religiously discriminatory behavior of fellow Seven Bridges residents—namely, Ms.

Tannenholz—which, in turn, limited the LaGrasso's ability to use services or facilities of the community. (DE 1 ¶ 62). The Association argues that, as a legal matter, its failure to control Ms. Tannenholz cannot serve as the basis for an FHA claim because the FHA does not protect against neighbor-to-neighbor discrimination on the basis of one of the protected characteristics enumerated in the statute. (*See* DE 21 at 11–12). The Parties do not cite, nor has the Court located, binding authority from the Eleventh Circuit or the United States Supreme Court that addresses whether a homeowner's association may be liable under the FHA for its failure to address prohibited discrimination from one resident to another. Indeed, the issue of housing provider liability for resident-on-resident discrimination appears to be a developing area of the law under the FHA.

In support of its position that such a claim is cognizable, the LaGrassos cite to other circuit court decisions and the Housing and Urban Development ("HUD") regulations, which seek to interpret and implement the FHA. In *Francis v. Kings Park Manor, Inc.*, the Second Circuit considered the broad language and remedial nature of the FHA and the relevant HUD regulations to conclude that "a landlord may be liable under the FHA for failing to intervene in tenant-on-tenant racial harassment of which it knew or reasonably should have known or had the power to address." 917 F.3d 109, 120–21 (2d Cir. 2019). The *Francis* court went on to articulate three elements that a plaintiff must establish to sustain an action for a housing provider's liability under the FHA: "(1) [t]he third-party created a hostile environment for the plaintiff . . . ; (2) the housing provider knew or should have known about the conduct creating the hostile environment . . . and (3) . . . the housing provider failed to take prompt action to correct and end the harassment while having the power to do so." *Id.* at 121 (quoting Quid Pro Quo and Hostile Environment Harassment, 81 Fed. Reg. at 63,069) (internal quotation marks omitted).

In the apparent absence of precedential case law in this Circuit on the viability of a housing provider's liability for the discriminatory conduct of third parties, for the purpose of resolving this Motion to Dismiss, I am persuaded by the reasoning and rule set forth in *Francis*. Applying that rule here, I am satisfied that the LaGrassos have plausibly alleged a claim against the Association for its failure to respond to or seek to control Ms. Tannenholz's allegedly discriminatory conduct. First, the LaGrassos plausibly allege that the third party, Ms. Tannenholz, created a hostile environment for them by, though not limited to, making religiously (and at least once, racially) charged derogatory and/or offensive comments to Mrs. LaGrasso via text message, telephone call, and in person and going to the LaGrassos' home on several occasions banging on their door, demanding they come outside, and yelling profanities. (DE 1 ¶¶ 35–44). As to the second element, I find that the LaGrassos have sufficiently alleged that the Association knew of Ms. Tannenholz's conduct based on Mr. LaGrasso's May 27, 2020 letter to the Association reporting same and requesting that the Board "open a case and initiate its formal complaint and sanctioning process . . . ." (DE 1 ¶ 45). With respect to the third element, I find that the LaGrassos have plausibly alleged that the Association failed to take prompt action to correct and end the harassment by stating that the Association took no action at all in response to Mr. LaGrasso's letter to investigate the allegations therein. (DE 1 ¶ 47). To the contrary, not only did the Association fail to attempt to resolve Mr. LaGrasso's complaint, it instead sanctioned Mrs. LaGrasso for her allegedly defamatory posts on her Facebook page and supposed verbal assault of Ms. Tannenholz while she was trespassing on the LaGrassos' property. (DE 1 ¶¶ 48–53). Based on these findings, at this stage of the proceedings, I decline to dismiss Count I to the extent that it maintains that the Association is liable for Ms. Tannenholz's allegedly discriminatory conduct.

## II.     Violation of 42 U.S.C. § 3617 (Count II)

In Count II, the LaGrassos allege that the Association "intimidated" them by sending letters "threatening and imposing baseless sanctions and fines," specifically in relation to Mrs. LaGrasso's Facebook posts and for "defending against a trespasser." (DE 1 ¶ 69). The LaGrassos also assert that the Association "interfered with the exercise and enjoyment of" their property rights "by refusing to undertake any action to control the behavior of third parties," such as Ms. Tannenholz. (*Id.* ¶ 73). The Association argues that Mrs. LaGrasso's Facebook posts are not "rights" protected under the FHA and that the LaGrassos fail to allege facts that the Association's decisions to impose sanctions against them were intentionally discriminatory. (DE 21 at 13–16). The Association further contends that its alleged inaction to control the conduct of Defendant Tannenholz does not legally constitute "interference with" the LaGrassos' use and enjoyment of their home. (*Id.* at 16–17).

As mentioned above, § 3617 of the FHA makes it unlawful "to coerce, *intimidate*, threaten, or *interfere* with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section[s 3603–3606]." 42 U.S.C. § 3617 (emphasis added). The Eleventh Circuit has concluded that § 3617 does not require proof of an independent violation of §§ 3603–3606 to create liability. *See Sofarelli v. Pinellas County,* 931 F.2d 718, 722 (11th Cir. 1991). To state a § 3617 intimidation or interference claim, a plaintiff must plead factual matter that, if true, plausibly demonstrates "(1) that the plaintiff exercised or enjoyed 'any right granted or protected by' Sections 3603-3606; (2) that the defendant's conduct constituted interference [or intimidation]; and (3) a causal connection existed between the exercise or enjoyment of the right and the defendant's conduct." *Moore v. Camden Property Tr.*, 816 F.

App'x 324, 335 (11th Cir. 2020). Moreover, the plaintiff must allege factual matter that, if true, would demonstrate discriminatory animus on the part of the defendant. *Sofarelli*, 931 F.2d at 722 (requiring plaintiffs to demonstrate that "race played some role" in defendants' actions that allegedly violated § 3617).

### A. Exercise or enjoyment of right protected by §§ 3603–3606

A plaintiff must first allege that she exercised or enjoyed a right under §§ 3603–3606. *Moore*, 816 F. App'x at 335. With respect to their intimidation claim, the Association argues that posting content on a social media platform does not constitute a right exercised or enjoyed under the FHA, as it does not relate to the pre- or post-acquisition conduct associated with the sale or rental of a home. (*See* DE 21 at 13–14). I agree with the Association on this point. Because I decline to find that Mrs. LaGrasso's making posts on her Bridges Seven Facebook page amount to a right protected under the FHA, I find that the LaGrassos have failed to sufficiently allege the first element of an intimidation claim under § 3617.

As regarding the interference claim, the LaGrassos allege that the Association's failure to "undertake any action to control the behavior of third parties," such as Ms. Tannenholz, interfered with the LaGrassos' exercise and enjoyment of their "property rights" under the FHA. (DE 1 ¶ 73). Given that a plaintiff's ability to use and enjoy their property rights free from discrimination on the basis of religion is protected by the FHA, I find that the LaGrassos have plausibly alleged that they exercised or enjoyed a right safeguarded by the FHA as to their interference claim.

### B. "Intimidated" or "interfered with"

Though the Eleventh Circuit has not spoken to precisely what level of conduct is required to create liability under § 3617, district courts in the Circuit have concluded that § 3617 extends only to "discriminatory conduct that is so severe or pervasive that it will have the effect of causing

a protected person to abandon the exercise of his or her housing rights." *Lawrence v. Courtyards at Deerwood Assn'n*, 318 F. Supp. 2d 1133, 1144 (S.D. Fla. 2004) (quoting *Gourlay v. Forest Lake Estates Civic Ass'n of Port Richey, Inc.*, 276 F. Supp. 2d 1222, 1235 (M.D. Fla. 2003), *vacated on other grounds*). As to the LaGrassos' intimidation claim, taking the Complaint's factual allegations as true, I am not satisfied that the Association's conduct of sending letters advising Mrs. LaGrasso of the complaints brought against her and the Board's proposed sanctions for such complaints constitutes intimidation that is of a severity as to cause the LaGrassos to abandon their housing rights altogether. For this reason and that stated in the above subsection, I conclude that the LaGrassos have not plausibly alleged an intimidation claim under § 3617.

Regarding the interference claim, consistent with my finding in Section II, I conclude that the LaGrassos plausibly allege unlawful interference under a hostile housing environment theory based on the Association's failure to respond to the LaGrassos' allegations of religious discrimination by Ms. Tannenholz and instead to impose additional sanctions on Mrs. LaGrasso, conduct alleged to have interfered with the LaGrassos' housing rights in a severe way. Moreover, I find that the LaGrassos have sufficiently alleged that a causal connection exists between the use and enjoyment of their property rights and the Association's failure to address Ms. Tannenholz's behavior.

### C. Discriminatory animus

As detailed above, the Complaint sets forth numerous allegations describing harassing behavior by Ms. Tannenholz that the Association purportedly failed to address. The LaGrassos allege that the Association's conduct was "intentional, willful, and taken in disregard" of their rights. (DE 1 ¶ 66). Taking this allegation as true, as well as those describing the harassment and the Association's lack of response thereto, it is reasonable to infer that the Association acted with

15

discriminatory intent. *See Iqbal*, 556 U.S. at 678 (permitting courts to "draw the reasonable inference that the defendant is liable for the misconduct alleged"). Accordingly, based on the foregoing and my finding that the LaGrassos plausibly allege that the Association acted with discriminatory animus, I will allow the interference claim to proceed.

### III.    Punitive Damages

The LaGrassos seek, among other forms of relief, punitive damages in the amount of $7,000,000, claiming that the Association's conduct "demonstrates a reckless disregard for those of certain religious backgrounds," was "willful," and "perform[ed] with actual or implied malice." (DE 1 at 16 ¶ 4). The Association has moved to strike this request for relief, arguing that the Complaint fails to allege facts that demonstrate and/or allow the Court to draw a reasonable inference that the Association's acts of omissions were intentional religious discrimination. (DE 21 at 17).

The FHA expressly provides for the recovery of punitive damages. 42 U.S.C. § 3613(c)(1) ("[I]f the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages . . . ."). Punitive damages are only recoverable in cases of "intentional discrimination" where the defendant acted with "malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529–30 (1999) (internal quotation marks and citation omitted). "The terms 'malice' or 'reckless indifference' pertain to the [defendant's] knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* at 535. Given that punitive damages are available under the FHA in certain circumstances, and that the crux of the LaGrassos' lawsuit is that the Association intentionally discriminated against them on the basis of their religion, I decline to curtail their ability to pursue punitive damages at this

juncture. Whether and, if so, to what extent, the LaGrassos may be entitled to punitive damages will be properly resolvable at a later stage of these proceedings.

## CONCLUSION

Upon careful consideration of the Complaint and applicable law, and taking the LaGrassos' allegations as true, as I must at the motion to dismiss stage, I find the LaGrassos have plausibly alleged §§ 3604(b) and 3617 claims under the FHA. Notwithstanding my finding that the Complaint can survive a motion to dismiss, I caution Plaintiffs that I seriously question whether the factual circumstances of this dispute legitimately amount to religious discrimination. Because of 12(b)(6)'s lenient standard in favor of plaintiffs, however, I conclude that dismissal would be improper at this stage.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

(1) Defendant Seven Bridges Homeowners Association, Inc.'s Motion to Dismiss the Complaint (DE 21) is **DENIED**.

(2) Defendant Seven Bridges Homeowners Association, Inc.'s Motion to Strike Plaintiffs' Claim for Punitive Damages (DE 21) is **DENIED**.

**SIGNED** in Chambers at West Palm Beach, Florida, this 9th day of December, 2020.

Donald M. Middlebrooks
United States District Judge

cc:   Counsel of Record