UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-81163-CV-MIDDLEBROOKS/Brannon

JEFFREY LAGRASSO and
DEBORAH LAGRASSO,

    Plaintiffs,

v.

SEVEN BRIDGES HOMEOWNERS
ASSOCIATION, INC.,

    Defendant.
_____/

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court on Defendant Seven Bridges Homeowners Association, Inc.'s ("Defendant") Motion for Final Summary Judgment (DE 118) and Plaintiffs Jeffrey LaGrasso and Deborah LaGrasso's ("Plaintiffs") Motion for Summary Judgment on the § 3604(b) Claim (DE 120). Both Motions are ripe. (DE 131; DE 129). For the following reasons, Defendant's Motion is granted, and Plaintiffs' Motion is denied.

### BACKGROUND

Plaintiffs, husband and wife, own a home in the Seven Bridges community in Palm Beach County, Florida. (DE 119, Plaintiffs' Statement of Material Facts ("Plaintiffs' SOMF") ¶ 1; DE 127, Defendant's Response to Plaintiffs' Statement of Material Facts ("Response SOMF") ¶ 1). Plaintiffs are Christians.

In March 2020, Deborah LaGrasso ("Mrs. LaGrasso") created a Facebook page titled "Bridges Seven." (DE 117, Defendant's Statement of Material Facts ("Defendant's SOMF") ¶ 16; DE 136, Plaintiffs' Response to Defendant's Statement of Material Facts ("Response SOMF")

1

¶ 16). Mrs. LaGrasso exclusively posted content to it. (*Id.*). Some of Mrs. LaGrasso's postings criticized the Seven Bridges' community restaurant, Prime 7. (*See* Defendant's SOMF ¶ 16.e.; Response SOMF ¶ 16.e.; DE at 117-14 at 300 ("Is the New Prime 7 Restaurant serving flies….Manager leaves front door wide open allowing rodents, pests and flies to enter the clubhouse restaurant. I would not be surprised if you see a dead fly in your burger or rat feces in your tune poke bowl. [sic]"). Other postings made reference to the Jewish tradition or Israel. (*See* Defendant's SOMF ¶ 16.f., g.; Response SOMF ¶ 16.f., g.; DE at 117-14 at 306–07). For instance, on May 16, 2020, Mrs. LaGrasso posted a photograph of a man wearing a shirt with the Israeli flag and the words "I'm a Christian and I support Israel"; her caption accompanying the photograph was "I support jewish call girls too!!!!! [sic]"

Sometime before May 16, 2020, fellow Seven Bridges resident, Rachael Tannenholz ("Ms. Tannenholz"), learned of the Bridges Seven Facebook page and posted on it, "If you are so unhappy why don't you move out." (Plaintiffs' SOMF ¶ 10; Response SOMF ¶ 10). Plaintiffs assert that Ms. Tannenholz also wrote, "Move out you stupid Shikska"; however, Ms. Tannenholz testified that she did not write that comment. (*Id.*).[1] Ms. Tannenholz is Jewish. (Plaintiffs' SOMF ¶ 12; Response SOMF ¶ 12).

Thereafter, Ms. Tannenholz came to learn that Mrs. LaGrasso was the anonymous individual who created and maintained the Bridges Seven page. (Plaintiffs' SOMF ¶ 13; Response SOMF ¶ 13). On May 16, 2020, Mrs. LaGrasso posted a photograph of Ms. Tannenholz wearing a dress and high heels to the Bridges Seven page with the caption: "Seven Bridges community

---

[1] "Shiksa" is a "disparaging and offensive term applied to a non-Jewish girl or woman." (DE 1 ¶ 36). Rabbi Jack Abramowitz has described the word as "simply indefensible," "inherently condescending, racist and misogynistic." (*Id.* (citing Jack Abramowitz, *The Jewish N Word*, Orthodox Union (Dec. 18, 2014), https://www.ou.org/life/inspiration/jewish-n-word/)).

stripper wants us to move out according to her last post……OH MY those platform shoes are horrendous.. must be so hard to type and dance on the pole at the same time.!!! [sic]" (Defendant's SOMF ¶¶ 12, 17; Response SOMF ¶¶ 12, 17; DE 117-14 at 305).

On May 18, 2020, Ms. Tannenholz advised Defendant of Mrs. LaGrasso's Bridges Seven Facebook page. (Defendant's SOMF ¶ 19; Response SOMF ¶ 19). That same day, Ms. Tannenholz went to Plaintiffs' home, rang the doorbell repeatedly, banged on the front door, and yelled for Mrs. LaGrasso to come outside. (Plaintiffs' SOMF ¶ 19; Response SOMF ¶ 19). Mrs. LaGrasso called the police, who issued Ms. Tannenholz a warning for trespassing. (*Id.*). Security for Seven Bridges was called, arrived after the police, spoke with Mrs. LaGrasso, and generated a security report. (Defendant's SOMF ¶ 19; Response SOMF ¶ 19). The report states that Mrs. LaGrasso explained to the two security officers that "she posted something on Facebook and one of the other residents at Seven [B]ridges (Rachel [Tannenholz]) thought it was about them, so Ms. [Tannenholz]then came to the Lagrasso home pounding on the door and yelling at her." (DE 117-3 at 85). Ms. Tannenholz testified that she went to Plaintiffs' home on May 18, 2020 to ask Mrs. LaGrasso to take the humiliating Facebook posting of her down from the Bridges Seven page. (Defendant's SOMF ¶ 21; Response SOMF ¶ 21). While Ms. Tannenholz was trespassing on Plaintiffs' property, Mrs. LaGrasso threatened to shoot Ms. Tannenholz. (*Id.*).

On May 19, 2020, Plaintiffs hired a bodyguard, who they let go after three to four days. (Defendant's SOMF ¶ 24; Response SOMF ¶ 24). On May 20, 2020, during a telephone conversation initiated by Mrs. LaGrasso, Ms. Tannenholz told Plaintiffs that they "d[id] not belong" in Seven Bridges, a community that according to Ms. Tannenholz, is "80% Jewish." (Defendant's SOMF ¶ 15; Response SOMF ¶ 15; Plaintiffs' SOMF ¶ 22; Response SOMF ¶ 22). Ms. Tannenholz advised Plaintiffs to "[m]ove to a Klan neighborhood . . . a white supremacist

3

area." (*Id.*). Ms. Tannenholz continued that if "[she] was hated as much as [Mrs. LaGrasso] [she] would move out" to avoid living somewhere where she cannot walk outside without everybody looking at her like she is "fucking crazy." (*Id.*).

One week later, Jeffrey LaGrasso ("Mr. LaGrasso") sent correspondence to Defendant, in which he requested that the Board "open a case and initiate its formal complaint and sanctioning process for the extremely disturbing, harassing and discriminatory conduct toward my wife and children by Rachel Aboud Tannenholz, a neighbor in our community." (Plaintiffs' SOMF ¶ 23; Response SOMF ¶ 23). Mr. LaGrasso advised in the letter that they had "video and audio recordings of Ms. Tannenholz engaging in repeated and protracted harassing and discriminatory conduct including trespassing upon our property, loitering and waiting outside of our home, shouting from the front yard, making anti-semitic statements and slanderous comments and stalking my wife both physically and online." (Plaintiffs' SOMF ¶ 25; Response SOMF ¶ 25).

On June 3, 2020, Mr. LaGrasso followed up with Defendant regarding his complaint, and the next day Defendant told him that the matter was under review. (Plaintiffs' SOMF ¶ 29; Response SOMF ¶ 29). On June 8, 2020, Mr. LaGrasso forwarded an audio recording of Mrs. LaGrasso and Ms. Tannenholz's May 20, 2020 telephone conversation to Defendant. (Plaintiffs' SOMF ¶ 30; Response SOMF ¶ 30). Ultimately, Defendant took no action in response to Plaintiffs' complaint, and did not inform Plaintiffs that it was declining to intervene. (Plaintiffs' SOMF ¶¶ 31–32; Response SOMF ¶¶ 31–32). Defendant did not take any action against Ms. Tannenholz because it did not believe that she had violated any of the community rules. (Plaintiffs' SOMF ¶ 33; Response SOMF ¶ 33).

On June 12, 2020, Defendant sent a letter to Mrs. LaGrasso, alleging that certain postings on Mrs. LaGrasso's Facebook page were, *inter alia*, "anti-semitic." (Plaintiffs' SOMF ¶ 34;

4

Response SOMF ¶ 34). In advance of the compliance committee hearing required by Fla. Stat. § 720.305, the HOA Board visited Mrs. LaGrasso's Bridges Seven Facebook page to select and screenshot the material perceived to be offensive that the Board then forwarded to the committee members. (Plaintiffs' SOMF ¶¶ 35–39; Response SOMF ¶¶ 35–39). On July 8, 2020, Defendant sent Plaintiffs correspondence stating that it had unanimously voted to assess a $5,000 fine against Mrs. LaGrasso and to suspend her use of the community's common areas for 330 days. (*Id.* ¶ 51). (Plaintiffs' SOMF ¶ 41; Response SOMF ¶ 41).

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" if it "might affect the outcome of the suit under the governing law." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute over a material fact is "genuine" if it could lead a reasonable jury to return a verdict in favor of the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment. Thus, [the court] do[es] not determine the truth of the matter, but instead decide[s] only whether there is a genuine issue for trial." *Barnett v. PA Consulting Group, Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)).

Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted). If a party against whom a motion is filed fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment for the movant is warranted. *Celotex Corp.*, 477 U.S. at 322. If a party against whom a motion is filed does not bear the burden of proof at trial, the nonmovant is entitled to summary judgment if the evidence cannot support one or more elements of the burdened party's claim. The party moving for summary judgment bears the burden of establishing that there is insufficient evidence to support the non-moving party's case/defense. *Id.* at 325.

## DISCUSSION

Plaintiffs bring two claims against Defendant under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.* Count I alleges that the Association violated 42 U.S.C. § 3604(b), which prohibits discrimination on account of "race, color, religion, sex, familial status, or national origin" in connection with "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith . . . ." Count II alleges that Defendant violated 42 U.S.C. § 3617, which makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section[s 3603–3606]." Federal courts have described the language of the FHA as "broad and inclusive," "prohibit[ing] a wide range of conduct," and having "a broad remedial purpose." *Ga. State Conference of the NAACP v. City of LaGrange*, 940 F.3d

627, 631–32 (11th Cir. 2019) (citing *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1278 (11th Cir. 2019) and *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972)) (internal quotation marks omitted). Here, both claims arise out of Defendant's alleged "post-acquisition conduct," which, as a general matter, may be actionable under the FHA. *See id.* at 632 (concluding that § 3604(b) "reaches certain post-acquisition conduct, including post-acquisition conduct related to the provision of services, as long as those services are connected to the sale or rental of a dwelling"). Defendant has moved for summary judgment as to both Counts, and Plaintiff has moved for summary judgment as to Count I.

## I.      Violation of 42 U.S.C. § 3604(b) (Count I)

Section 3604(b) of the FHA prohibits discrimination "in the provision of services or facilities in connection [with the sale or rental of a dwelling] *because of . . . religion . . . .*" 42 U.S.C. § 3604(b) (emphasis added). Discrimination is "differential," "less favorable" treatment of similarly situated individuals. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005); *Newport News Shipbuilding & Dry Dock Co.*, 462 U.S. 669, 682 n.22 (1983). The phrase "because of" is synonymous with "by reason of" or "on account of," which, in other words, means that the protected characteristic—in this case, religion—was the reason that the defendant so acted. *Gross v. FBL Financial Servs.*, 557 U.S. 167, 176 (2009) (internal quotation marks omitted).

While there appears to be no binding authority from the Eleventh Circuit or the United States Supreme Court that addresses whether a homeowner's association may be liable under the FHA for its failure to address prohibited resident-on-resident discrimination, I am persuaded by the Second Circuit's treatment of this issue in *Francis v. Kings Park Manor, Inc.*, 917 F.3d 109 (2d Cir. 2019). In *Francis*, the plaintiff, an African American man, presented evidence that over an eight-month period, his white neighbor subjected him to repeated racial slurs, discussed the

plaintiff in derogatory terms with other neighbors, and threatened to kill the plaintiff. *Francis*, 917 F.3d at 121. The plaintiff informed the landlord on two occasions about the repeated and overtly racially charged harassment by providing specific details about the racial slurs and death threats directed to the plaintiff. *Id.* The Second Circuit held that a housing provider may be liable under the FHA for failing to intervene in resident-on-resident harassment on the basis of a protected characteristic when it knew or reasonably should have known about the harassment or had the power to address it. *See id.*, 917 F.3d at 120–21.

The *Francis* court articulated three elements that a plaintiff must establish to prevail in an action for a housing provider's liability under a hostile housing environment theory: "(1) [t]he third-party created a hostile environment for the plaintiff . . . ; (2) the housing provider knew or should have known about the conduct creating the hostile environment . . . and (3) . . . the housing provider failed to take prompt action to correct and end the harassment while having the power to do so." *Id.* at 121 (quoting Quid Pro Quo and Hostile Environment Harassment, 81 Fed. Reg. at 63,069) (internal quotation marks omitted).

### A. Defendant's Motion for Summary Judgment

In its Motion for Summary Judgment, Defendant argues that judgment should be entered in its favor on Count I because Plaintiffs cannot prove (1) that Ms. Tannenholz's conduct was religiously motivated, (2) that such conduct rose to the level of creating a hostile housing environment, or (3) that Defendant had the power to prevent the actions of Ms. Tannenholz. (DE 118 at 7).

As to the first *Francis* element, Defendant argues that it is entitled to summary judgment because the evidence cannot support a finding that Ms. Tannenholz created a hostile housing environment for Plaintiffs by discriminating against them on the basis of their religion. The

interactions between Mrs. LaGrasso and Ms. Tannenholz that form the core of Plaintiffs' FHA claims spanned approximately five days between May 16, 2020 and May 20, 2020, and according to Plaintiffs, continued thereafter in the form of Ms. Tannenholz riding her bicycle by Plaintiffs' home on a daily basis. (Plaintiffs' SOMF ¶ 43). The question before me is whether a reasonable jury could find that a hostile housing environment existed based upon the following facts, construed in the light most favorable to Plaintiffs:

- **Around May 16, 2020:** Ms. Tannenholz commented on the Bridges Seven Facebook page, "If you are so unhappy why don't you move out." (Plaintiffs' SOMF ¶ 10; Response SOMF ¶ 10). Plaintiffs assert that Ms. Tannenholz also wrote, "Move out you stupid Shikska" (although Ms. Tannenholz denies this). (*Id.*).

- **May 16, 2020:** Mrs. LaGrasso posted a photograph of Ms. Tannenholz on the Bridges Seven page and referred to her as the "Seven Bridges community stripper." (Defendant's SOMF ¶¶ 12, 17; Response SOMF ¶¶ 12, 17; DE 117-14 at 305).

- **May 18, 2020:** Ms. Tannenholz advised Defendant that Mrs. LaGrasso was the anonymous user behind the controversial Bridges Seven Facebook page. (Defendant's SOMF ¶ 19; Response SOMF ¶ 19). That same day, Ms. Tannenholz went to Plaintiffs' home, and Mrs. LaGrasso called the police. (Plaintiffs' SOMF ¶ 19; Response SOMF ¶ 19). Security for Seven Bridges responded to the scene whereupon Mrs. LaGrasso explained that Ms. Tannenholz "came to the Lagrasso home pounding on the door and yelling at her" because Mrs. LeGrasso had " posted something on Facebook[.]"(Defendant's SOMF ¶ 19; Response SOMF ¶ 19; DE 117-3 at 85).

- **May 20, 2020:**. During a phone call between Mrs. LaGrasso called Ms. Tannenholz, Ms. Tannenholz told Plaintiffs that they "d[id] not belong" in Seven Bridges, a community that according to Ms. Tannenholz, is "80% Jewish." (Defendant's SOMF ¶ 15; Response SOMF ¶ 15). Ms. Tannenholz advised Plaintiffs to "[m]ove to a Klan neighborhood . . . a white supremacist area." (*Id.*). Ms. Tannenholz continued that if "[she] was hated as much as [Mrs. LaGrasso] [she] would move out" to avoid living somewhere where she cannot walk outside without everybody looking at her like she is "fucking crazy." (*Id.*).

- After these incidents, Ms. Tannenholz rode her bicycle by Plaintiffs' home and continues to do so, and Plaintiffs perceive this conduct to be harassing. Ms. Tannenholz denies that she ever rides her bicycle by Plaintiffs' home. (Plaintiffs' SOMF ¶ 43; Response SOMF ¶ 43).

9

I note that there is substantial conflict in the record with respect to the specific evidence that is relevant to the determination of whether a triable issue exists on Plaintiffs' hostile housing environment claim. Where there is conflict, I am bound to view all evidence in the light most favorable to the parties opposing the motion (in this context, the Plaintiffs), and I must resolve all reasonable doubts in their favor. *See United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

Given that hostile housing environment claims under the FHA are a developing area of law in this circuit, I draw on more established legal standards from the Title VII hostile work environment context. "[A] hostile work [in this case, housing] environment claim addresses acts . . . whose very nature involves repeated conduct, such as discriminatory intimidation, ridicule, and insult." *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114-16 (2002)) (internal quotation marks omitted). To prevail on a hostile environment claim, the harassment must be sufficiently severe or pervasive, judged under both an objective reasonableness standard and a subjective standard. *Id.* (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002)). In determining the objective component, a court looks to all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance." *Id.* (quoting *Morgan*, 536 U.S. at 116) (internal quotation marks omitted).

In *McCann*, the Eleventh Circuit held that "[a]lthough offensive, [] instances of racially derogatory language alone, extending over a period of more than two years, are too sporadic and isolated to establish that [the plaintiff's] employers' conduct was so objectively severe or pervasive as to alter the terms and conditions of her employment." *McCann*, 526 F.3d at 1379 (affirming summary judgment); *see also Mosley v. MeriStar Mgmt. Co., LLC*, 137 F. App'x 248, 252 (11th

Cir. 2005) (affirming summary judgment on hostile work environment claim as insufficiently severe where the plaintiff experienced two isolated incidents of racial slurs).

For the purpose of this analysis, I will assume that Plaintiffs can establish the subjective component of their hostile housing environment claim. However, based on the above-described facts, construed in Plaintiffs' favor, I conclude that the evidence presented is insufficient as a matter of law to satisfy the objective component of a hostile housing environment claim. The record shows that of the few interactions between Mrs. LaGrasso and Ms. Tannenholz, only two such instances bear any relation whatsoever to religious animus. First, though disputed, I must assume that around May 16, 2020, Ms. Tannenholz wrote on Mrs. LaGrasso's Facebook page, "Move out you stupid Shikska." Second, and undisputed is the fact that on May 20, 2020, Ms. Tannenholz told Plaintiffs to move out of Seven Bridges, an 80% Jewish neighborhood, because they did not belong and instead to move to a Klan neighborhood or white supremacist area. I acknowledge that these comments are overtly religiously and/or racially charged and thus may support a finding that the conduct complained of was severe. However, overall, I find that these two instances of offensive remarks made by Ms. Tannenholz over the span of a few days are isolated incidents of discriminatory conduct and thus do not support a finding that the discriminatory conduct was so pervasive that it objectively created a hostile housing environment.

Plaintiffs appear to attempt to bolster their position that Ms. Tannenholz's conduct was and is pervasive because she rides her bicycle by their home. Though Ms. Tannenholz denies this, I will assume Mrs. LaGrasso's version of the story is true. Even so, merely riding a bicycle by someone's home on a daily basis, particularly where the home is located in the rider's same neighborhood, is immaterial to a claim for religious discrimination and does not warrant an inference that such conduct constitutes discriminatory harassment. And finally, as an aside,

11

viewing Ms. Tannenholz's conduct toward Plaintiffs in a vacuum highlights the egregiousness of her remarks, but viewing Ms. Tannenholz's conduct in the context of Mrs. LaGrasso publicly accusing her of being the "community stripper" has the effect of detracting from the severity to a certain degree. While Ms. Tannenholz's conduct and language were by no means justified, it bears noting that such conduct did not rise out of thin air but instead was the product of a relationship infused with considerable animosity for reasons that appear to have had nothing to do with religion.

Based on these findings, I need not reach the second and third *Francis* elements but will do so for the sake of completeness of the record. It is my view that triable issues of fact exist as to the remaining elements, such that if Plaintiffs had been able to establish that a hostile housing environment existed, the claim would have survived Defendant's motion for summary judgment.

Regarding the second *Francis* element—whether Defendant knew or should have known of the alleged religiously discriminatory conduct—Defendant argues that while it was aware of the May 18, 2020 incident because of the security report and Mr. LaGrasso's subsequent letter, there was no indication that the alleged religious discrimination by Ms. Tannenholz was ongoing or escalating. (DE 118 at 10). On this element, the question is whether a reasonable jury could find that Defendant knew or should have known of the purported discriminatory conduct.

The undisputed evidence shows that Defendant first knew about the May 18, 2020 interaction between Mrs. LaGrasso and Ms. Tannenholz based on the report generated by the community's security service. While this report only indicated that Mrs. LaGrasso and Ms. Tannenholz were feuding over a Facebook post, on May 27, 2020, Mr. LaGrasso sent correspondence to Defendant wherein he requested that Defendant initiate its complaint and sanctioning process due to the "extremely disturbing, harassing and discriminatory conduct toward my wife and children" by Ms. Tannenholz. (Plaintiffs' SOMF ¶ 23; Response SOMF ¶ 23; DE

123-7 at 247). Mr. LaGrasso advised in the letter that they had "video and audio recordings of Ms. Tannenholz engaging in repeated and protracted harassing and discriminatory conduct including trespassing upon our property, loitering and waiting outside of our home, shouting from the front yard, making anti-semitic statements and slanderous comments and stalking my wife both physically and online." (*Id.*). Mr. LaGrasso's correspondence described the conduct as "harassing and discriminatory . . . such that a hostile environment now exists for my family within our community." (DE 123-7 at 247). In addition, on June 8, 2020, Mr. LaGrasso forwarded a portion of the audio recording of Mrs. LaGrasso and Ms. Tannenholz's telephone conversation in which Ms. Tannenholz made the remarks about Plaintiffs moving out of the predominantly Jewish neighborhood because they did not belong and were hated there. (Plaintiffs' SOMF ¶ 30; Response SOMF ¶ 30). On these facts, a reasonable jury could find that Defendant knew or should have known of the alleged hostile housing environment.

      As to the third *Francis* element—whether the housing provider failed to take prompt action to correct and end the harassment while having the power to do so—Defendant argues that it could not have acted to correct and end the harassment because it does not have the power under its Governing Documents or the Florida Statutes to control who Ms. Tannenholz communicates with, either in person or online. (DE 118 at 10–11). In their Response, Plaintiffs contend that Defendant's argument is disingenuous because it found it had the authority to sanction Mrs. LaGrasso for verbally assaulting Ms. Tannenholz and for her purportedly anti-semitic Facebook postings. (DE 131 at 12–14). While I readily acknowledge Defendant's point that it cannot control who Ms. Tannenholz interacts with and how she does so, the relevant inquiry is whether once Defendant was put on notice of the alleged hostile housing environment, did it have the power to correct and end the harassment? Based on the fact that Defendant exercised those powers to sanction Mrs.

LaGrasso for her conduct in the community and online, a reasonable jury could find that Defendant had the authority to exercise those same powers to investigate Ms. Tannenholz's conduct and impose an appropriate sanction.

Notwithstanding these findings on the second and third *Francis* elements, I conclude as a matter of law that that no reasonable jury could find a hostile housing environment on this record. Therefore, even though Defendant's summary judgment arguments fail as they pertain to those particular elements, Defendant prevails because the facts cannot support a finding that Ms. Tannenholz's two incidents of religious discrimination were sufficiently pervasive to constitute a hostile environment. Accordingly, as to Plaintiffs' hostile housing environment theory of liability, summary judgment is granted for Defendant on Count I.[2]

### B. Plaintiffs' Motion for Summary Judgment

In their Motion, Plaintiffs assert that they are entitled to summary judgment on Count I because there is no genuine dispute of material fact that Defendant violated § 3604(b) of the FHA in two ways: "by failing to control the conduct of [Ms.] Tannenholz ([] the indirect claim), and by targeting Mrs. LaGrasso's religious posts to accuse her of being 'anti-semitic' ([] the direct claim)." (DE 120 at 5).

In light of my discussion, *supra*, Plaintiffs' Motion is denied insofar as it argues violations of § 3604(b) based upon a hostile housing environment theory.

Plaintiffs' second theory is that Defendant subjected Plaintiffs to disparate treatment on the basis of their religion by identifying purportedly anti-semitic postings on Mrs. LaGrasso's

---

[2] Plaintiffs also argue an alternative theory of liability (disparate treatment) under Count I, and an analysis of that aspect of Plaintiffs' § 3604(b) claim is set forth, *infra*, in the context of analyzing *Plaintiffs'* Motion for Summary Judgment. Defendant did not move for summary judgment as to the disparate treatment theory.

Facebook page and sanctioning her for them, while taking no action against Ms. Tannenholz for her conduct. (DE 120 at 8–11).

To establish a prima facie violation of § 3604(b) based on a disparate treatment theory, Plaintiffs must prove (1) that they are members of a protected class; (2) that they suffered adverse treatment in regards to housing, and (3) that their protected class status was in part a motivating factor for their adverse treatment. *See Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999). A disparate treatment claim also requires a plaintiff to show that he or she has been treated differently than similarly situated people outside of the protected class. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1216 (11th Cir. 2008). Therefore, Plaintiffs would have to show that Defendant treated similarly situated non-Christians differently than Mrs. LaGrasso.

Assuming that Mrs. LaGrasso belongs to a protected class (Christians), and that she suffered adverse treatment in regard to housing in the form of a monetary assessment and suspension of use of the communal facilities, the question before me is whether a reasonable jury presented with this evidence could conclude that Plaintiffs' protected class status was in part a motivating factor for the adverse treatment. *See, e.g.*, *Hinson v. Clinch Cty., Georgia Bd. of Educ.*, 231 F.3d 821, 828–29 (11th Cir. 2000). I find that a jury could not, as Plaintiffs have not set forth sufficient direct or circumstantial evidence that Defendant investigated and sanctioned Mrs. LaGrasso because of her status as a Christian.

Plaintiffs bear the burden of proof to establish a prima facie case of religious discrimination on a disparate treatment theory at trial. Plaintiffs argue that when Defendant identified what it deemed to be anti-semitic postings on Mrs. LaGrasso's Bridges Seven Facebook page, it was discriminating against her on the basis of her religion as a Christian because Defendant was not simultaneously identifying any content posted by Ms. Tannenholz that was discriminatory toward

Mrs. LaGrasso. However, identifying postings that were allegedly anti-semitic does not equate to discriminating against Mrs. LaGrasso because she is a Christian. Defendant asserts that there is no direct or circumstantial evidence that Mrs. LaGrasso's status as a Christian played any role in Defendant's decision to sanction her. I agree.

In addition, the evidence does not support a finding that Ms. Tannenholz and Mrs. LaGrasso were similarly situated. Therefore, to the extent that Defendant treated them differently, there is no basis upon which to find that the reason for so doing was because of religion. Plaintiffs seem to argue that Mrs. LaGrasso and Ms. Tannenholz were similarly situated because Defendant was aware of "religious tension" between them. (DE 120 at 10). However, the correspondence from Defendant to Plaintiffs imposing the $5,000 fine and 330-day suspension explained that the sanctions were based upon (1) Mrs. LaGrasso's threat to shoot Ms. Tannenholz; (2) Mrs. LaGrasso's Facebook posts containing damaging content about the clubhouse's restaurant due to allegations of pest feces and insects in the food; (3) Mrs. LaGrasso's Facebook posts criticizing Defendant, its officers, and committee members; and (4) Mrs. LaGrasso's Facebook posts deemed to be anti-semitic. (DE 127, Defendant's Additional Facts ¶¶ 72, 82–83; DE 117-3 at 89–93). Though Ms. Tannenholz certainly engaged in reprehensible behavior in the form of calling Mrs. LaGrasso a "Shikska" and telling Plaintiffs they did not belong in the 80% Jewish neighborhood, Ms. Tannenholz did not threaten physical violence or maintain a public forum for disparaging the community. For these reasons, though Ms. Tannenholz and Mrs. LaGrasso both conducted themselves in a discriminatory and offensive manner pertaining to each other's religion, Ms. Tannenholz was not similarly situated to Mrs. LaGrasso who, from Defendant's perspective, had engaged in a multitude of other objectionable conduct too. Thus, Defendant's decision not to fine

or suspend Ms. Tannenholz did not amount to selective enforcement of the community's Governing Documents on the basis of religion.

Accordingly, Plaintiffs have failed to establish a prima facie case for disparate treatment discrimination, and they are not entitled to summary judgment on their § 3604(b) claim under that theory.

## II. Violation of 42 U.S.C. § 3617 (Count II)

Defendant moves for summary judgment as to Count II of Plaintiffs' complaint. Section 3617 of the FHA makes it unlawful "to coerce, intimidate, threaten, or *interfere* with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section[s 3603–3606]." 42 U.S.C. § 3617 (emphasis added). The Eleventh Circuit has concluded that § 3617 does not require proof of an independent violation of §§ 3603–3606 to create liability. *See Sofarelli v. Pinellas County,* 931 F.2d 718, 722 (11th Cir. 1991). To prevail on a § 3617 interference claim, a plaintiff must prove "(1) that the plaintiff exercised or enjoyed 'any right granted or protected by' Sections 3603-3606; (2) that the defendant's conduct constituted interference; and (3) a causal connection existed between the exercise or enjoyment of the right and the defendant's conduct." *Moore v. Camden Property Tr.*, 816 F. App'x 324, 335 (11th Cir. 2020). "Interference is more than a quarrel among neighbors or an isolated act of discrimination, but rather is a pattern of harassment, invidiously motivated." *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009) (internal quotation marks omitted).

Though the Eleventh Circuit has not spoken to precisely what level of conduct is required to create liability under § 3617, district courts in the Circuit have concluded that § 3617 extends only to "discriminatory conduct that is so severe or pervasive that it will have the effect of causing

a protected person to abandon the exercise of his or her housing rights." *Lawrence v. Courtyards at Deerwood Assn'n*, 318 F. Supp. 2d 1133, 1144 (S.D. Fla. 2004) (quoting *Gourlay v. Forest Lake Estates Civic Ass'n of Port Richey, Inc.*, 276 F. Supp. 2d 1222, 1235 (M.D. Fla. 2003), *vacated on other grounds*). Moreover, the plaintiff must demonstrate discriminatory animus on the part of the defendant. Sofarelli, 931 F.2d at 722 (requiring plaintiffs to demonstrate that "race played some role" in defendants' actions that allegedly violated § 3617).

Plaintiffs' theory of § 3617 liability is that Defendant interfered with Plaintiffs' exercise and use of their housing rights by (1) failing to respond to Plaintiffs' allegation of religious discrimination by Ms. Tannenholz and (2) retaliating against Plaintiffs for complaining about Ms. Tannenholz by alleging pretextual rule violations and imposing additional fines and suspensions. (DE 131 at 15).

Plaintiffs assert that Defendant's failure to control Ms. Tannenholz's alleged discriminatory conduct on the basis of religion amounted to an interference with Plaintiffs' exercise and enjoyment of their property rights under the FHA. As discussed above, the conduct Plaintiffs complain of with respect to Ms. Tannenholz appears to have been responsive to Mrs. LaGrasso's insulting Facebook post of Ms. Tannenholz; nevertheless, it is certainly reasonable to infer that Ms. Tannenholz's conduct toward Mrs. LaGrasso was religiously motivated given the highly offensive character Ms. Tannenholz's language. And indeed I must draw such an inference in Plaintiffs' favor at this stage, given that they are the nonmovants.

In terms of what Defendant knew about the interactions between Mrs. LaGrasso and Ms. Tannenholz, the evidence shows that on May 18, 2021, Mrs. LaGrasso advised the community security that Ms. Tannenholz had come to her house to complain about a certain Facebook post; on May 27, 2020, Mr. LaGrasso sent correspondence to Defendant reporting the allegedly

discriminatory conduct of Ms. Tannenholz; on June 8, 2020, Plaintiffs provided Defendant with a partial recording of the telephone call had between Mrs. LaGrasso and Ms. Tannenholz; and on June 11, 2020, Plaintiffs advised Defendant that they would be pursuing legal action against Ms. Tannenholz in the form of seeking a restraining order. Construing these facts in the light most favorable to Plaintiffs, I will also assume that Defendant was on notice of Ms. Tannenholz's religiously harassing conduct. Even so, in my view this evidence cannot support a jury finding that the harassment was sufficiently severe and pervasive that it would tend to cause Plaintiffs to abandon their housing rights altogether.

Moreover, and perhaps most importantly, the record wholly lacks evidence of discriminatory animus *on the part of Defendant.* That is, no reasonable jury could find on these facts that Defendant failed to take action against Ms. Tannenholz because Mrs. LaGrasso is a Christian. Accordingly, I find that Defendant is entitled to summary judgment on the § 3617 claim based on Plaintiffs' interference theory.

Plaintiffs also contend that Defendant violated § 3617 by retaliating against Mrs. LaGrasso for reporting Ms. Tannenholz's conduct by imposing a fine and use suspension against her. Again, this claim fails because there is no indication in this record that Defendant intentionally discriminated against Plaintiffs on the basis of their religion.[3]

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

(1) Defendant's Motion for Final Summary Judgment (DE 118) is **GRANTED**.

(2) Final judgment as to Count II will be entered by separate Order.

---

[3] Though Defendant moves for summary judgment as to Plaintiffs' demand for punitive damages, I need not reach this argument in light of my above rulings against Plaintiffs.

(3) In accordance with Federal Rule of Civil Procedure 56(f), within seven days of this Order, Plaintiffs may file supplemental briefing relating to the one outstanding theory of liability under Count I before the Court enters judgment against them on that count.

(4) Plaintiffs' Motion for Summary Judgment on the § 3604(b) Claim (DE 120) is **DENIED**.

(5) Defendant's Objection to and Motion to Strike Declaration of Jeffrey LaGrasso (DE 121-1) (DE 126); Defendant's Amended Objection to and Motion to Strike Declaration of Deborah LaGrasso (DE 130-1 and DE 136-1) (DE 150); and Defendant's Motion to Strike Plaintiff's Re-Filed Response to Defendant's Statement of Material Facts (DE 153) are **DENIED AS MOOT**.

(6) Plaintiffs' Re-Filed Motion Instanter to Deem Exhibits Timely Filed (DE 161) is **GRANTED**.

**SIGNED** in Chambers at West Palm Beach, Florida, this 14th day of May, 2021.

_____
DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

cc:   Counsel of Record